UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ERIC ROSS

VERSUS

DARRELL VANNOY, WARDEN

CIVIL ACTION

NO.  22-1652

SECTION "H"(4)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.    Factual Background

The petitioner, Eric Ross ("Ross"), is a convicted inmate incarcerated in the Louisiana State Penitentiary, in Angola, Louisiana.  On December 10, 2009, Ross was charged in Orleans Parish with the second degree murder of Albert McClebb, Jr., in violation of La. Rev. Stat. § 14:30.1.[2]  Ross entered a plea of not guilty in the case.[3]

The record reflects that on October 6, 2008, two (2) victims were shot near the intersection of L.B. Landry and Erie Streets near the Fisher Housing Development in Algiers.[4]  McClebb, who

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2] St. Rec. Vol. 1 of 8, Bill of Indictment, 12/10/09.

[3] St. Rec. Vol. 1 of 8, Minute Entry,12/16/09.

[4] The facts were taken from the opinion the Louisiana Supreme Court.  *State v. Ross*, 144 So. 3d 932, 934-39

was shot fourteen (14) times, was killed.  The surviving victim refused to cooperate with police.  Crimestoppers tips indicated that members of the SuWu gang were responsible for the shootings.  Ross was a known member of the SuWu gang.

The sole eyewitness, Conrad Jackson, identified Ross as one of the shooters.  Jackson gave a recorded statement to Detective Anthony Pardo.  Jackson also testified before the grand jury and identified Ross as one of the perpetrators.  At the time of Ross's trial, Jackson was incarcerated.  He admitted to having unrelated criminal drug charges pending against him and to having numerous prior drug convictions.  At trial, Jackson testified that on October 6, 2008, he was on his way to visit his niece in the Fisher Housing Development.  Jackson would not respond to further questions and stated that he "didn't observe nothing" when asked what he saw on October 6, 2008.  He claimed that a girl told him that someone had just killed her brother.  Jackson conceded that he gave a statement to Detective Pardo.  Jackson claimed, however, that he told Pardo "whatever he wanted to hear."  Jackson admitted that he identified Ross from a six-person lineup.  He claimed, however, that Pardo asked him only if he knew any of the persons depicted, and that Jackson indicated that he knew Ross.  He testified that he "didn't see that dude shoot nobody."

The prosecution played a portion of Jackson's recorded statement for the jury.  Jackson identified his voice on the recording.  The proceedings were recessed for the Trial Court to obtain counsel for Jackson.  Jackson attempted to invoke his Fifth Amendment right not to testify.  The Trial Court ruled that he could not invoke the Fifth Amendment in advance of any potentially perjured testimony.  The trial resumed, and the remainder of Jackson's recorded statement was

---

(La. 2014); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2013-K-0175, at pp. 1-5 (La. 3/25/14).

played for the jury.  According to the statement, Jackson identified Ross as the perpetrator and identified him in a photographic line up.

After the statement was played in its entirety, when he was asked whether he remembered giving the statement, Jackson stated, "I plead the Fifth.  I ain't testifying."  When the Trial Court instructed Jackson to answer the questions, he responded, "You can do perjury or whatever.  I didn't see that man shoot nobody."  He was nonresponsive when asked whether he remembered speaking to Assistant District Attorney Margaret Parker.  The Trial Court declared Jackson a hostile witness at the request of the prosecution.  Jackson thereafter refused to respond to any of the questions that were asked relating to his previous statements about McClebb's murder, and he repeatedly attempted to invoke the Fifth Amendment.  The Trial Court advised Jackson that "there's no Fifth Amendment privilege that you can invoke at this time."  Jackson continued to claim that he "did not see that man shoot nobody," and repeatedly indicated that he was "not answering no more questions."

On cross-examination, Jackson claimed that he spoke with authorities about the murder only because he was hoping to get assistance on an unrelated "bunk" drug charge.  On redirect, the prosecution inquired about a beating Jackson had received in prison approximately two (2) months prior to trial, which left him hospitalized.  Jackson denied the prison fight was related to the instant matter, stating, "That have nothing to do with this dude."

After Jackson claimed that he did not remember testifying before the grand jury, the prosecution sought to introduce into evidence a transcript of Jackson's grand jury testimony.  The Trial Court allowed the transcript to be published to the jury over the objection of defense counsel.  According to Jackson's grand jury testimony, he was headed to the Fisher Housing Development

to visit his niece on October 6, 2008.  Jackson was driving his car on a street that runs along the side of the Development.  He witnessed the car in front of him pull over to the right in front of a corner store.  Jackson saw two people jump out of the car and shoot McClebb and another man who were standing on the sidewalk in front of the store.  Jackson identified Ross as one of the shooters.  Jackson, who knew Ross since he was a baby, was certain of his identification.  Jackson explained that he originally was hesitant to get involved and did not come forward earlier because he lived in the same neighborhood as Ross, who he knew was a gang member.  Jackson further explained that he later chose to provide the police with information when he felt the violence in the area was getting out of control.

After reviewing the grand jury testimony, Jackson again testified that he did not remember telling the grand jury that Ross shot McClebb or anything else regarding his grand jury testimony.

Assistant District Attorney Margaret Parker, who worked on the case in 2009, testified that she spoke to Jackson on several occasions.  She recalled that Jackson told her that Ross shot the victim.  Parker testified that Jackson indicated to her numerous times, including on the day of trial, that he was very concerned about the safety of his mother and his girlfriend, as well as his own personal safety should he testify against Ross.

Detective Pardo testified about the steps taken in the investigation.  He also testified about Jackson's March 26, 2009 statement wherein Jackson identified Ross as the perpetrator.  Pardo also confirmed that Jackson identified Ross from a photographic line-up.

Ross was tried on March 14, 2011, and was found guilty as charged by a unanimous jury verdict.[5]  On April 29, 2011, the Trial Court sentenced Ross to life imprisonment at hard labor without the benefits of probation, parole, or suspension of sentence.[6]

On direct appeal, Ross's appointed counsel asserted that: (1) insufficient evidence supported the conviction; (2) Jackson's statement to police was erroneously admitted; (3) the Trial Court erred in admitting hearsay evidence of Assistant District Attorney Parker; and (4) the Trial Court erred in permitting the prosecution to introduce Jackson's grand jury testimony for purposes of impeachment.[7]  On December 19, 2012, the Louisiana Fourth Circuit found that the Trial Court abused its discretion in admitting the grand jury testimony, vacated Ross's conviction, and remanded the case for a new trial.[8]

On November 15, 2013, the Louisiana Supreme Court granted the State's application for writ of review.[9]  On March 25, 2014, the Louisiana Supreme Court found that the State demonstrated a compelling need for publication of the grand jury testimony, reversed the decision of the appellate court, reinstated Ross's conviction and sentence, and remanded the case for consideration of the remaining claims.[10]

---

[5]St. Rec. Vol. 1 of 8, Trial Minutes, 3/14/11; St Rec. Vol. 4 of 8, Trial Transcript, 3/14/11; St. Rec. Vol. 5 of 8, Verdict, 3/14/11.

[6]St. Rec. Vol. 1 of 8, Sentencing Minutes, 4/29/11; St. Rec. Vol. 5 of 8, Sentencing Transcript, 4/29/11.

[7]St. Rec. Vol. 5 of 8, Appellate Brief, 2011-KA-1668, 1/6/12.

[8]*State v. Ross*, 144 So. 3d 1037, 1038-40 (La. App. 4th Cir. 2012); St. Rec. Vol. 5 of 8, 4th Cir. Opinion, 2011-KA-1668, at pp. 1-5, 12/19/12.

[9]*State v. Ross*, 125 So. 3d 1095 (La. 2013); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2013-K-0175, 11/15/13; La. S. Ct. Writ Application, 13 K 175, 1/18/13.

[10]*State v. Ross*, 144 So. 3d 932 (La. 2014); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2013-K-0175, 3/25/14.

On June 4, 2014, the Louisiana Fourth Circuit affirmed Ross's conviction and sentence.[11] The court found the evidence presented sufficiently supported Ross's conviction.[12]  The court found that defense counsel did not object to the introduction of Jackson's statement to Pardo, and, as a result, the error was not preserved for appellate review.[13]  Finally, the court found that the Trial Court did not err in admitting Parker's testimony.[14]

On February 13, 2015, the Louisiana Supreme Court denied Ross's related writ application without assigning reasons.[15]  On June 22, 2015, the United States Supreme Court denied Ross's application for writ of certiorari.[16]  Ross's conviction and sentence became final that same day. *See Geisberg v. Cockrell*, 288 F.3d 268 (5th Cir. 2002) (for purposes of the AEDPA, a state conviction becomes final when a petition for certiorari is denied by the United States Supreme Court); *Crutcher v. Cockrell*, 301 F.3d 656, 657 (5th Cir. 2002) (same); *Hoffman v. Louisiana*, 768 So. 2d 592, 592 (La. 2000) (conviction not final until application for writ of certiorari to U.S. Supreme Court is denied).

On May 27, 2016, Ross filed an application for post-conviction relief asserting the following claims for relief: (1) he was denied the right to a fair trial when the prosecution mentioned "other crimes" evidence without a *Prieur* hearing;[17] and (2) ineffective assistance of

---

[11] *State v. Ross*, 144 So. 3d 1118 (La. App. 4th Cir. 2014); St. Rec. Vol. 5 of 8, La. App. 4th Cir. Opinion, 2011-KA-1668, 6/4/14.

[12] *Id.* at 1121-22; St. Rec. Vol. 5 of 8, La. App. 4th Cir. Opinion, 2011-KA-1668, at pp. 3-5 6/4/14.

[13] *Id.* at 1122; St. Rec. Vol. 5 of 8, La. App. 4th Cir. Opinion, 2011-KA-1668, at p. 5, 6/4/14.

[14] *Id.* at 1122-23; St. Rec. Vol. 5 of 8, La. App. 4th Cir. Opinion, 2011-KA-1668, at pp. 5-6, 6/4/14.

[15] *State v. Ross*, 159 So. 3d 462 (La. 2015); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2014-K-1415 (La. 2/13/15).

[16] *Ross v. Louisiana*, 135 S. Ct. 2866 (2015).

counsel in failing to (a) investigate potential defense witnesses; (b) present alibi witnesses; and (c) move for a mistrial when the prosecution presented "other crimes" evidence.[18]  Ross included the February 15, 2016 affidavits of Belinda Jackson and Tyler Wilson who claimed that Ross was playing video games at Wilson's house at the time of the murder.[19]  In response, the State asserted procedural objections.[20]

Ross filed a supplemental memorandum on September 27, 2018, claiming: (1) ineffective assistance of appellate counsel in failing to raise on appeal that the State improperly introduced character evidence of Ross's unsubstantiated gang affiliation; and (2) ineffective assistance of trial counsel in failing to investigate the case and call alibi witnesses.[21]  The Trial Court sustained the State's procedural objections on December 7, 2018.[22]  The State filed a response to Ross's claims of ineffective assistance of counsel along with the affidavit of Edward Rantz, Ross's trial attorney.[23]  Rantz stated in his affidavit that everyone Ross told him would provide him with an alibi was either uncooperative or stated that they did not know Ross's whereabouts at the time of

---

[17]Under Louisiana law, a *Prieur* hearing requires that before evidence of other crimes are introduced, the trial court must determine that the extraneous acts are probative of a real issue and that their probative value exceeds their prejudicial effect.  *See State v. Taylor*, 217 So. 3d 283, 291 (La. 2016) (citing *State v. Prieur*, 277 So.2d 126 (La. 1973)).

[18]St. Rec. Vol. 1 of 8, Uniform Application for Postconviction Relief, 5/27/16.

[19]St. Rec. Vol. 1 of 8, Affidavit of Tyler Wilson, 2/15/16; Affidavit of Belinda Jackson, 2/15/16.

[20]St. Rec. Vol. 1of 8, State's Procedural Objections to Defendant's Application for Post-Conviction Relief, 5/12/17.

[21]St. Rec. Vol. 1of 8, Supplemental Memorandum in Support of Petitioner's Application for Post-Conviction Relief, 9/27/18.

[22]St. Rec. Vol. 1 of 8, Judgment, 12/7/18.

[23]St. Rec. Vol. 1 of 8, State's Response on the Merits to Defendant's Application for Post-Conviction Relief and Motion to Summarily Deny, 4/12/19; Affidavit of Edwards J. Rantz, Esq., 4/6/19.

the murder.[24]   The Trial Court heard arguments relating to the remaining claim of ineffective assistance of counsel, and denied that claim on June 7, 2019.[25]

The Louisiana Fourth Circuit granted Ross's related writ application and remanded the case for the state district court to hold an evidentiary hearing to "evaluate the veracity of the [Petitioner's] evidence."[26]   The Louisiana Supreme Court denied the State's related writ application on November 4, 2020.[27]

The Trial Court held an evidentiary hearing on May 19, 2021, at which it heard the testimony of Ross as well as Wilson, Shanta Ross, and Rhonda Ross.[28]   The Trial Court granted Ross a recess to seek testimony from Miguel Nunez, the investigator who notarized the February 2016 statements of Wilson and Belinda Jackson, but when the hearing resumed on July 15, 2021, no additional witnesses or evidence were presented.[29]   On October 13, 2021, after hearing arguments, the Trial Court granted the State's motion to dismiss, and denied Ross's application for post-conviction relief.[30]

---

[24]St. Rec. Vol. 1 of 8, Affidavit of Edwards J. Rantz, Esq., 4/6/19.

[25]St. Rec. Vol. 1 of 8, Judgment, 6/7/19.

[26] St. Rec. Vol. 6 of 8, 4th Cir. Order, 2019-K-0644, 11/20/19; 4th Cir. Writ Application, 2019-K-0644, 7/29/19.

[27]*State v. Ross*, 303 So. 3d 649 (La. 2020); St. Rec. Vol. 8 of 8, La. S. Ct. Order, 2019-KH-01993, 11/4/20; La. S. Ct. Writ Application, 19 KP 1993, 12/17/19.

[28]St. Rec. Vol. 1 of 8, Evidentiary Hearing Minutes, 5/19/21; St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, 5/19/21.

[29]St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, 5/19/21; St. Rec. Vol. 1 of 8, Hearing Minutes, 5/19/21; Minute Entry, 7/15/21.

[30]St. Rec. Vol. 1 of 8, Minute Entry, 10/13/21; St. Rec. Vol. 3 of 8, Judgment, 10/13/21; St. Rec. Vol. 4 of 8, State's Motion to Dismiss; 10/13/21.

Ross filed a "Notice of Intent to Appeal" with the Louisiana Fourth Circuit on November 8, 2021.[31]  The following day, the court granted the writ *pro forma*, but denied relief until the court could render a decision on the merits.[32]  Ross filed a pro se writ application.[33]  Because the record was incomplete, the Louisiana Fourth Circuit initially denied relief on the showing made, but invited Ross's counsel to file another writ application.[34]  Ross's counsel filed another writ application.[35]  The Louisiana Fourth Circuit denied relief on February 15, 2022.[36]

On May 10, 2022, the Louisiana Supreme Court denied Ross's related writ application without assigning reasons.[37]

## II.   **Federal Habeas Petition**

On June 3, 2022, Ross filed his original petition for federal habeas corpus.[38]  Ross raises the following claims for relief: (1) ineffective assistance of counsel for failing to investigate the case and call defense witnesses; (2) insufficient evidence supports his conviction; (3) admission

---

[31]St. Rec. Vol. 6 of 8, Notice of Intent to Appeal the October 13, 2021, Judgment of the Criminal District Court, Parish of Orleans Section "H," Denying Application for Post-Conviction Relief in Case No, 493-086, Hon. Camille Buras, Judge, Presiding, Pursuant to U.R.C.A. Rule(s) 4-2, 4-2, 4-5, 11/2/21.

[32]St. Rec. Vol. 6 of 8, La. App 4th Cir Order, 2021-K-0619, 11/9/21.

[33]St. Rec. Vol 6 of 8, La. App. 4th Writ Application, 2021-K-0638, 11/9/21.

[34]St. Rec. Vol. 6 of 8, La. App 4th Cir Order, 2021-K-0638, 12/9/21.

[35]St. Rec. Vol. 6 of 8, La. App. 4th Writ Application, 2021-K-0746, 12/17/21.

[36]St. Rec. Vol. 6 of 8, La. App 4th Cir Order, 2021-K-0746, 2/15/22.

[37]*State v. Ross*, 337 So. 3d 090 (La. 2022); St. Rec. Vol. 8 of 8, La. S. Ct. Order, 2022-KP-0456, 5/10/22; La. S. Ct. Writ Application, 2022-KP-0456, 3/17/22.

[38]Rec. Doc. No. 1.

of the grand jury testimony violated *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150 (1940).[39]

The State filed a response admitting that Ross's petition is timely and that his claims are exhausted.[40]  The State asserts that Ross's claims are meritless.[41]

## III.    <u>General Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[42] applies to this petition, which was filed in this Court under the mailbox rule on June 3, 2022.[43]   The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State concedes that Ross's petition was timely filed, and his claims are exhausted.[44]

---

[39]Rec. Doc. No. 1, pp. 6, 8-9; Rec. Doc. No. 1-1, pp. 7-22.

[40]Rec. Doc. No. 15.

[41]*Id.* at pp 13-24.

[42]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[43]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Ross certified that he placed his petition in the prison mailing system on June 3, 2022.  Rec. Doc. No. 1, at p. 15; Rec. Doc. No. 1-1, at p. 22.

[44]While the State concedes that Ross timely filed his habeas application, the State's calculation with regard to timeliness is incorrect.  As noted, Ross's conviction became final on June 22, 2015.  He filed his application for

**IV.** <u>**Standards of a Merits Review**</u>

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's

decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions

of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the Court must

give deference to the state court findings unless they were based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2)

(2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The amended statute also codifies

the "presumption of correctness" that attaches to state court findings of fact and the "clear and

convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.

28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are

reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference

be given to the state court's decision unless the decision is "contrary to or involves an unreasonable

application of clearly established federal law" as determined by the United States Supreme Court.

*Hill*, 210 F.3d at 485. The "critical point" in determining the Supreme Court rule to be applied "is

that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so

obvious that a clearly established rule applies to a given set of facts that there could be no

'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S.415, 134 S. Ct. 1697,

1706-07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "Thus, 'if a habeas court

---

post-conviction relief on May 27, 2016, 339 days later. That application ceased to be pending on May 10, 2022, when the Louisiana Supreme Court denied his related writ application. At that time, Ross had twenty-six (26) days remaining. He filed his habeas petition on June 3, 2022, twenty-four (24) days later.

must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts.  *White*, 134 S. Ct. at 1706-07; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *See Williams*, 529 U.S. at 410.  The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *Id.*  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the

precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## V.    Ineffective Assistance of Counsel (Claim One)

In claim one, Ross asserts that his counsel was ineffective in failing to investigate and adequately prepare for trial. He specifically claims that his trial counsel failed to interview and call alibi witnesses including Tyler Wilson and Belinda Jackson.

The State responds that the state courts did not unreasonably apply *Strickland* in determining that Ross failed to meet his burden to establish ineffective assistance of counsel.

Ross raised these claims on state post-conviction review. After an evidentiary hearing, the Trial Court denied relief without making explicit findings.[45]  In the last reasoned opinion, the Louisiana Fourth Circuit found that Ross failed to meet his burden that trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), and *State v. Washington*, 491 So.2d 1337, 1339 (La. 1986).[46]  The court explained that the witnesses presented by Ross at the evidentiary hearing, including himself, his family members, and a friend, were interested parties, and that the Trial Court did not abuse its discretion in determining that the testimony presented as to Ross's alleged alibi "was not particularly credible, especially given the witnesses' difficulties in providing an accurate timeline of the killing."[47]

---

[45]St. Rec. Vol. 1 of 8, Minute Entry, 10/13/21; St. Rec. Vol. 3 of 8, Judgment, 10/13/21.

[46]St. Rec. Vol. 6 of 8, La. 4th Cir. Order, 2021-K-0746, 2/15/21.

[47]*Id.*

Initially, Ross claims that the district court's improperly considered the affidavit of Eddie

Rantz, Ross's trial counsel, under La. Code Crim. P. art. 1672(B).  A federal habeas court,

however, does not sit to correct errors made by state courts in interpreting and applying state law.

*Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-

68 (1991)).  Thus, any alleged violation of state law does not merit federal habeas corpus review

or relief.  *Accord Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  Instead, federal habeas review

is limited to reviewing whether a state prisoner is being held "in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Clark v.

Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).

The question for this Court is whether the state courts' denial of relief was contrary to, or an

unreasonable application of, federal law as determined by the Supreme Court.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-

part test for evaluating claims of ineffective assistance of counsel in which the petitioner must

prove deficient performance and prejudice therefrom.  *Strickland*, 466 U.S. at 687.  The petitioner

has the burden of proving ineffective assistance of counsel by a preponderance of the evidence.

*Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296

(1992).  In deciding ineffective assistance claims, a court need not address both prongs of the

conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's

failure to meet either prong of the test.  *Amos v. Scott*, 61 F.3d 333, 348 (1995).

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct

failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *See Styron v.

Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).   "The defendant must show that counsel's

representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See id.* at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009).

The reviewing court must "judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington*, 562 U.S. at 104, 131 S.Ct. 770 (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell*, 535 U.S. at 702, 122 S.Ct. 1843 (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland,* 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. *Strickland*, 466 U.S. at 689; *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2022); *Clark v. Johnson*, 227 F.3d 273, 282–83 (5th Cir. 2000). Tactical decisions when supported by the

circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) (citing *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997), and *Mann v. Scott*, 41 F.3d 968, 983–84 (5th Cir. 1994)).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bell*, 535 U.S. at 695 (quoting *Strickland*, 466 U.S. at 694); *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Furthermore, "[t]he petitioner must 'affirmatively prove,' [and] not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112. Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller*, 200 F.3d at 282 (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 690). The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland*

with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.*, at 105 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) therefore is "doubly deferential." *Cullen*, 563 U.S. at 190, 131 S.Ct. 1388 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 112, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009)). The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, and quoting *Knowles*, 556 U.S. at 121 n.2, 129 S.Ct. 1411).

As indicated, Ross claims that his trial counsel failed to investigate the case and call alibi witnesses. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).

However, the defense of a criminal case does not "contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). An attorney is not necessarily ineffective for failing to investigate every conceivable, potentially nonfrivolous matter or defense. *Id*.

A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998) (citation omitted); *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011). In other words, a petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation

would have shown.  *Diaz v. Quarterman*, 239 F. App'x 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696, in recognizing that some evidence is required to show that "the decision reached would reasonably likely have been different."). Instead, to prevail on such a claim, the petitioner must provide factual support as to what exculpatory evidence further investigation would have revealed. *See Moawad*, 143 F.3d at 948; *see also Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005); *Davis v. Cain*, No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008) (order adopting referenced Report and Recommendation).

In an overlapping claim, he faults his counsel's failure to subpoena Tyler Wilson and Belinda Jackson. He claims that they would have provided alibi testimony. "'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" *Graves v. Cockrell*, 351 F.3d 143, 156 (5th Cir. 2003) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). "'Failure to present [evidence does] not constitute 'deficient' performance within the meaning of *Strickland* if [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise.'" *Williams v. Cockrell*, 31 F. App'x 832, at *3 (5th Cir. 2002) (quoting *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997)).

To prevail on a claim relating to the failure to call witnesses, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray*, 265 F. Appx at 298).  There must be a "'reasonable probability' that the uncalled witness

would have made [a] difference to the results." *Alexander v. McCotter*, 775 F.2d 595, 603 (5th Cir. 1985) (citation omitted).

Initially, Ross filed the February 2016 affidavits of Belinda Jackson and Tyler Wilson in support of his application for post-conviction relief. In her affidavit, which she executed more than seven years after the murder, Belinda Jackson stated that she witnessed Ross walk to her daughter's home to visit with Tyler Wilson on October 6, 2008.[48] According to Jackson, about 35 to 45 minutes later, and at some time before 6:00 p.m., she received a phone call that "Tootie" was killed.[49] She told the caller that she had just seen "Tootie," known as Ross, walk to her daughter's home.[50] Belinda Jackson claimed that she immediately walked to her daughter's home where she found Wilson and Ross playing video games.[51] She recalled that she told Ross that someone named "Tootie" had been killed, and that Ross replied that he was fine and that he had been at her daughter's home.[52] Belinda Jackson claimed that no one spoke to her about the incident until Miguel Nunez questioned her about it, although she did not specify when that questioning first occurred.[53]

In his February 2016 affidavit, Wilson stated that Ross called him around 3:00 p.m. and asked if he could come over.[54] Wilson claimed that Ross came to his house between 4:00 p.m.

---

[48]St. Rec. Vol. 1 of 8, Affidavit of Belinda Jackson, at p. 1, 2/15/16.

[49]*Id.*

[50]*Id.*

[51]*Id.* at p. 2.

[52]*Id.*

[53]*Id.*

[54]St. Rec. Vol. 1 of 8, Affidavit of Tyler Wilson, at p. 1, 2/15/16.

and 4:30 p.m. on the day of the murder.[55]  He claimed that D. Hester was with Ross.[56]  Wilson also claimed that "LaCroy Ballett" and Vernika Jackson were also present.[57]  Wilson claimed that, about ten minutes later, Vernika Jackson left to go to the Ross's home to attend a card game.[58] Wilson claimed that he, Ballett, Hester, and Ross played a video game for the next four hours.[59] According to his affidavit, at some point, Wilson received a phone call from "Brittney" that Ross had been killed.[60]  Wilson told Brittney that Ross was sitting next to him.[61]  Wilson claimed that Ross's mother called Ross's phone, and that Vernika Jackson and Ross's mother came to the house to check on his welfare and to make sure he was alive.[62]  Wilson claimed that they eventually learned that the person killed was a man who lived at the Fisher Housing Development and who was also nicknamed "Tootie."[63]

According to Wilson, they went back to playing video games, and later that evening they went out and bought clothes to go out that evening.[64]  Wilson claimed they then went to Ross's home to eat and afterwards went to a club. [65]  Wilson claimed that no one ever spoke to him about

---

[55]*Id.* at p. 2.

[56]*Id.*
[57]*Id.* at p. 2.

[58]*Id.*

[59]*Id*.

[60]*Id.*

[61]*Id.*

[62]*Id.*

[63]*Id.*

[64]*Id.*

[65]*Id.*

the incident.[66]  He claimed Michael Nunez was the first person to talk to him about Ross, although he did not specify when that first occurred. [67]

The State submitted the affidavit of attorney Edward Rantz dated April 6, 2019.[68]  Rantz stated that everyone Ross told him would provide him with an alibi was either uncooperative and/or stated that they did not know of Ross's whereabouts at the time of the crime.[69]  Rantz stated that he attempted to locate witnesses who would provide favorable testimony, but that his efforts were unsuccessful.[70]  Rantz further stated that he would have called Wilson and Belinda Jackson to testify at trial if he had reason to believe that either would have provided favorable testimony,.[71]

At the evidentiary hearing on May 19, 2021, Ross testified that on October 6, 2008, Wilson called him and asked him to come over to play video games before they went out later that night.[72]  Ross claimed that he walked from his mother's home to Wilson's home, about three (3) townhouses down.[73]  Ross's claimed that his friend, LaCroix Belette, and Vernika Jackson were also present at Wilson's home.[74]  Ross testified that he and Wilson played a video game.[75]  Ross stated that his phone rang, but that he did not answer it because he was playing a video game.[76]

---

[66]*Id.*

[67]*Id.*
[68]St. Rec. Vol. 1 of 8, Affidavit of Edward J. Rantz, Esq., 4/6/19.

[69]*Id.* at p. 1.

[70]*Id.*

[71]*Id.*

[72]St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, at p. 11, 5/19/21.

[73]*Id.* at p. 13.

[74]*Id.* at pp. 14, 20-21.

[75]*Id.* at pp. 13-15.

[76]*Id.* at pp. 15, 46.

Ross claimed that, it was just beginning to get dark, around 4:00 or 5:00 p.m., and that he had been playing video games for about four (4) hours, when Belinda Jackson ran into the house and said that she was relieved to see Ross because she had received a call that Ross had been killed.[77] Ross testified that while he was speaking with Belinda Jackson, his mother, grandmother, sister, and his child's mother all ran into the house, and rejoiced over the fact that he was alive.[78] Eventually, Ross answered his phone, and a friend told him that he thought he was dead.[79] Ross claimed that he never left Wilson's house.[80]

Ross claimed that he told Rantz about his alibi witnesses when Rantz was first appointed to represent Ross.[81] Ross initially testified that Rantz told him that he did not have to worry about it because "when a guy's making a statement like that, you don't need no witnesses."[82] Ross explained that Rantz told him that he did not need to call any witnesses because Conrad Jackson testified that he did not witness anything.[83] Ross originally claimed that, because Conrad Jackson claimed that he did not witness the murder, neither Rantz nor an investigator ever spoke with his alibi witnesses.[84] Ross testified that he tried to persuade Rantz during trial to call his alibi witnesses, but that Rantz refused to call them.[85] Ross initially claimed that his alibi witnesses were

---

[77]*Id.* at pp. 15-16, 28-29, 41-42, 47.

[78]*Id.* at pp. 16-19, 28, 46.

[79]*Id.* at p. 17.

[80]*Id.* at p. 19.

[81]*Id.* at pp. 20 -22, 29, 33-34, 44-45.

[82]*Id.* at pp. 21-24, 38-39.

[83]*Id.* at pp. 22-24.

[84]*Id.* at p. 24.

[85]*Id.* at pp. 24-26, 31-33.

already present outside of the courtroom on the day of trial.[86]  He later claimed that his witnesses

were at a pretrial hearing, not at the trial.[87]  Ross then claimed that his mother, Belette, and Wilson

attended his trial.[88]  He claimed that Wilson and Belinda Jackson signed earlier affidavits than the

ones he filed in 2016, but admitted that he did not have copies of them.[89] On re-direct, Ross claimed

that Rantz originally told him that he would investigate his alibi witnesses and would call them to

testify, but once Conard Jackson testified, Rantz told him it was not necessary to call any defense

witnesses.[90]

    Wilson testified that he had known Ross for over 30 years.[91] Wilson testified that on

October 6, 2008, Ross called him and told him he was coming over because his mother was hosting

a card game.[92] Wilson could not recall what time Ross arrived, but remembered that it was still

daylight outside.[93] He claimed that Vernika Jackson was upstairs, and that LaCroix and a person

he referred to as "D" were also present.[94] Wilson claimed that they had been playing video games

for hours when Ross paused the game to answer his phone.[95] Wilson claimed that the caller told

Ross that he heard that "Tootie" got killed.[96] At the same time, someone allegedly called Wilson

---

[86]*Id.* at p. 31.

[87]*Id.* at p. 37.
[88]*Id.* at p. 38.

[89]*Id.* at pp. 39-40.

[90]*Id.* at pp. 45-46.

[91]*Id.* at pp. 50, 59.

[92]*Id.* at p. 50.

[93]*Id.* at p. 52.

[94]*Id.* at pp. 52-53.

[95]*Id.* at p. 53.

[96]*Id.*

with the same information.[97] Wilson testified that, after receiving the phone call, Ross said he was going to his mother's house, and that Ross was walking out the door when Belinda Jackson and Ross's mother came to check on him.[98]

Wilson testified that he later learned of Ross's arrest.[99] Wilson asserted that Rhonda Ross, Ross's mother, told Wilson that she was going to retain an attorney for Ross, and that Wilson told her to let him know if they need anything from him.[100] Wilson claimed that, in either 2010 or 2011, prior to Ross's trial, a private investigator named Miguel took his statement.[101] Wilson claimed that he expected to testify at Ross's trial.[102] Wilson claimed that he did not learn that Ross had gone to trial until after he had been convicted.[103]

Shanta Ross, Ross's older sister, testified that Ross was known by the nickname "Tootie."[104] She explained that late in the evening on October 6, 2008, she was at her mother's house when her mother, grandmother, and other people present in the home began receiving phone calls that a person named "Tootie" had been killed.[105] Shanta Ross explained that, earlier that day, Ross had gone down the street to play video games.[106] Shanta Ross claimed that her mother and

---

[97]*Id.*

[98]*Id.* at p. 54.

[99]*Id.* at pp. 58-59.

[100]*Id.* at pp. 55, 59.

[101]*Id.* at pp. 56-58.

[102]*Id.* at p. 57.

[103]*Id.* at pp. 58, 61.

[104]*Id.* at p. 64.

[105]*Id.* at pp. 64-65, 67.

[106]*Id.* at p. 65.

her grandmother left to go check on Ross to verify that he was safe.[107] Shanta Ross claimed that she followed them about five minutes later.[108] Shanta Ross related that, when they saw Ross, he told them that he also had received a phone call about the shooting.[109] Shanta Ross claimed that she spoke with the private investigator, Miguel, on the phone prior to Ross's trial in either 2010 or 2011.[110] She admitted, however, that she never signed a statement.[111] Allegedly at the time she spoke to Miguel, she told him that Ross was at the home of Wilson and Belinda Jackson at the time of the murder.[112] She explained that she did not attend the trial because she was pregnant.[113]

Rhonda Ross, Ross's mother, testified at the hearing that she spoke with Ross's trial attorneys about Ross's alibi.[114] She, however, could not remember what she told them.[115] Rhonda Ross recalled a meeting at her house with Miguel and Wilson that alleged occurred prior to Ross's trial.[116] She claimed that Miguel questioned them both.[117] Rhonda Ross testified that she told

---

[107]*Id.* at p. 66.

[108]*Id.* at p. 66.

[109]*Id.*

[110]*Id.* at pp. 67-68

[111]*Id.* at pp. 69-70.

[112]*Id.* at p. 68.

[113]*Id.*

[114]*Id.* at p. 72.

[115]*Id.*

[116]*Id.* at p. 73.

[117]*Id.*

Miguel that she watched Ross walk to Wilson's house prior to the murder.[118]  She, however, did not recall signing any statement.[119]

While Ross presented evidence that his witnesses would have testified in his defense, the state courts obviously found Ross's witnesses' testimony not to be credible.  It is clear that a "state habeas court's factual determinations, including its credibility findings, are entitled to a presumption of correctness under § 2254(e)(1) ...," and, therefore, must be rebutted by clear and convincing evidence on federal review.  *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009); *Kinsel v. Cain*, 647 F.3d 265 (5th Cir. 2011) ("credibility determinations in particular are entitled to a strong presumption of correctness.") Here, the record as a whole supports the state courts' conclusions that the alibi witnesses' testimony was not credible. Further, Ross has not presented any evidence, much less the required clear and convincing evidence, to refute the state courts' credibility finding.

While each of the witnesses at the evidentiary hearing presented alibi testimony, the testimony was not consistent. While Wilson claimed that D. Hester was with Ross when Ross came to Wilson's home, Ross made no mention of Hester.[120]  While Ross claimed Vernika Jackson was present at the home, Wilson stated in his affidavit that she left their home to attend the card game at Ross's home.[121]  Ross claimed that he initially did not answer his phone, and first learned of the shooting when people came to the house to check on his wellbeing.[122] However, Wilson

---

[118]*Id.* at pp. 73-74.

[119]*Id.* at p. 75.

[120]St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, at pp. 20, 52-53, 5/19/21.

[121]*Id.* at pp. 14, 20; St. Rec. Vol. 1 of 8, Affidavit of Tyler Wilson, at p. 2, 2/15/16.

[122]*Id.* at p. 15-18, 28-29, 41-42, 46-47.

specifically testified that Ross paused the video game to answer his phone, and that both he and Ross received calls alerting them to the shooting.[123] Wilson further testified that, after receiving the news of the shooting via phone calls, Ross was leaving Wilson's home when Belinda Jackson and Ross's mother arrived.[124] Additionally, while Ross testified that Wilson attended his trial, Wilson testified that he did not learn of Ross's trial until it occurred.[125]

Also, as noted by the Louisiana Fourth Circuit,[126] none of the witnesses provided an accurate timeline. The murder occurred at approximately 7:30 in the evening.[127] Ross, however, testified that he learned of the shooting between 4:00 p.m. and 5:00 p.m.[128] Wilson could not recall the time.[129] Shanta Ross testified that, she was unsure, but she believed it was late in the evening.[130] Belinda Jackson stated in her affidavit that it was sometime before 6:00 p.m. that she learned of the shooting.[131]

Furthermore, Ross never presented the testimony of Miguel Nunez despite being given months to secure his testimony of Miguel Nunez.[132] For these reasons, the Court cannot say that the state courts' decision was so beyond pale that it was not entitled to deference.

---

[123]*Id.* at p. 53.

[124]*Id.* at p. 54.

[125]St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, at pp. 38, 58, 61, 5/19/21.

[126]St. Rec. Vol. 6 of 8, 4th Cir. Order, 2021-K-0746, at p. 2, 2/15/22.

[127]St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, at p. 41, 5/19/21.

[128]*Id.* at pp. 29, 41.

[129]*Id.* at pp. 52, 55.

[130]*Id.* at pp. 66-67.

[131]St. Rec. Vol. 1 of 8, Affidavit of Belinda Jackson, at p. 1, 2/15/16.

[132]*See* St. Rec. Vol. 4 of 8, Post-Conviction Hearing Transcript, at pp. 75-77, 5/19/21; St. Rec. Vol. 1 of 8, Minute Entry, 7/15/21.

Ross also fails to show prejudice required by *Strickland* as a result of his counsel's failure to call the witnesses to provide alibi testimony.  As relatives and close friends of Ross, the alibi witnesses were hardly disinterested witnesses and their testimony would have been subject to vigorous cross-examination.  It is highly likely that the jury would have considered the witnesses inherently suspect and would have possibly discounted their testimony.  *See, e.g.*, *Ball v. United States*, 271 F. App'x 880, 884 (11th Cir. 2008) (petitioner's wife, brothers, and cousin "were all close family members with a strong motive to fabricate an alibi defense for him.  As such, their testimony would not have been particularly compelling and would have been subjected to vigorous impeachment.  If trial counsel had called these alibi witnesses and the jury had disbelieved them, the jury also could have inferred that [petitioner] was in fact the [perpetrator]."); *Lewis v. Cain*, Civ. Action No. 09-2848, 2009 WL 3367055, at *11 (E.D. La. Oct. 16, 2009) (noting that petitioner's "grandmother's testimony would have been of limited value because her close familial relationship to the petitioner would have made her testimony inherently suspect"), *aff'd*, 444 F. App'x 835 (5th Cir. 2011); *Sholes v. Cain*, Civ. Action No. 06-1831, 2008 WL 2346151, at *15 (E.D. La. June 6, 2008) (noting that petitioner's girlfriend would be an inherently suspect alibi witness), *aff'd*, 370 F. App'x 531 (5th Cir. 2008); *Talley v. Cain*, Civ. Action No. 08-3542, 2009 WL 916331, at * 11 (E.D. La. Apr. 6, 2009) (noting that alibi testimony from the petitioner's mother would have been inherently suspect); *United States ex rel. Emerson v. Gramley*, 902 F. Supp. 143, 147 (N.D. Ill. 1995) (noting that petitioner's mother was an "interested witness" and, therefore, "would not have provided persuasive evidence of an alibi"), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  As a result, Ross has not demonstrated a reasonable probability that the testimony of Wilson, Belinda Jackson, his mother or his sister would have altered the outcome of the trial.

For all of these reasons, Ross has failed to demonstrate that the state courts' decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

## VI. <u>Insufficient Evidence (Claim Two)</u>

Ross next claims that the evidence was insufficient to support his conviction for second degree murder. He claims that the Louisiana Fourth Circuit unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in finding that the evidence was sufficient to convict him.

The State argues that there was ample evidence to support Ross's conviction, and that the claim is meritless.

The Louisiana Fourth Circuit addressed the sufficiency of the evidence on direct appeal. The Louisiana Fourth Circuit, relying on the standards set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), found a rational trier of fact could have found that the evidence was sufficient to support Ross's conviction. The Louisiana Supreme Court denied relief without assigning reasons.

Claims of insufficient evidence present a mixed question of law and fact. *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). The Court must therefore give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of Supreme Court law. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

The appropriate standard for determining the sufficiency of evidence is set forth in *Jackson*, which requires a court to determine whether, after viewing the record and the evidence in the light

most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Perez*, 529 F.3d at 594; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011).  Louisiana law allows for a crime to be proven by both direct and circumstantial evidence.

Under Louisiana law, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La. Rev. Stat. § 15:438. However, on federal habeas corpus review, the court does not apply this state law, "reasonable hypothesis" standard, and instead must apply the *Jackson* and AEDPA standards of review.  *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992) (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)). To the extent Ross relies on Louisiana's circumstantial evidence rule itself, "[t]his is not a purely separate test from the *Jackson* standard to be applied instead of a sufficiency of the evidence test.... Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt."  *State v. Porretto*, 468 So. 2d 1142, 1146 (La. 1985); accord State v. Williams, 693 So. 2d 204, 209 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury.  If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails."  *State v. Maxie*, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); *accord Williams*, 693 So. 2d at 209. The appropriate standard for this Court on habeas review remains *Jackson*.

The Court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court is to consider all of the trial evidence as a whole under *Jackson*); *Johnson v. Cain*,

347 F. App'x 89, 91 (5th Cir. 2009) (quoting *Jackson*, 443 U.S. at 324) (*Jackson* standard relies "upon the record evidence adduced at the trial.").  Significantly, the review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.  *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (per curiam) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see also Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  A reviewing federal habeas court, therefore, is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (1995) (citing *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985)). All credibility choices and conflicting inferences must be resolved in favor of the verdict.  *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.' " *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U.S. at 324 n.16).

Ross was charged with and convicted of second degree murder. Louisiana defines second degree murder as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm."  La. Rev. Stat. § 14:30.1(A)(1). The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal

consequences to follow his act or failure to act." La. Rev. Stat. § 14:10(1). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Sharlhorne*, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); *State v. Tate*, 851 So.2d 921, 930 (La. 2003) (citing *State v. Brooks*, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill can be implied by the intentional use of a deadly weapon, such as a knife or a gun. *State v. Collins*, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing *State v. Brunet*, 674 So.2d 344, 349 (La. 1996)).

In reaching its decision, the Fourth Circuit noted that Ross did not dispute that the victim was shot numerous times or that the perpetrator had the specific intent to kill or inflict great bodily harm, and only challenged his identification as the perpetrator.[133] The court found that the evidence presented at trial sufficiently supported that Ross shot the victim with the specific intent to kill or to inflict great bodily harm.[134]

Ross faults the Louisiana Fourth Circuit for focusing "solely on the identity" of the perpetrator. However, the parties stipulated that McClebb was shot fourteen (14) times, and that his death was classified as a homicide.[135] The parties further stipulated that four spent projectiles were recovered from the victim's body, and that thirteen shell casings from two different firearms were recovered from the scene.[136] Thus, the remaining element was the identity of the perpetrator.

---

[133]Ross, 144 So. 3d at 1122; St. Rec. Vol. 5 of 8, 4th Cir. Opinion, 2011-KA-1668, at p. 4, 12/19/12.

[134]*Id.*; St. Rec. Vol. 5 of 8, 4th Cir. Opinion, 2011-KA-1668, at pp. 4-5, 12/19/12.

[135]St. Rec. Vol. 4 of 8, Trial Transcript, at pp. 8-9, 3/14/11; St. Rec. Vol. 5 of 8, State's Offer of Stipulations, 3/14/11.

[136]*Id.* at pp. 9-11.

Ross, as he did on direct appeal, appears to challenge the sufficiency of the evidence to prove his identification as a perpetrator of the crime. Under Louisiana law, in addition to proving the statutory elements of the charged offense at trial, the State is required to prove a defendant's identity as a perpetrator. *State v. Draughn*, 950 So.2d 583, 593 (La.), *cert. denied*, 552 U.S. 1012 (2007); *State v. Thomas*, 192 So.3d 291, 303 (La. App. 5th Cir. 2016); *State v. Ingram*, 888 So.2d 923, 926 (La. App. 5th Cir. 2004). Where the key issue is identification, the State is required to negate any reasonable probability of misidentification. *Id.* However, a positive identification by only one witness is sufficient to support a conviction. Under both federal and Louisiana law, the testimony of a single eyewitness is generally sufficient to support a conviction. *See United States v. King*, 703 F.2d 119, 125 (5th Cir. 1983); *State v. Neal*, 796 So.2d 649, 658 (La. 2001); *State v. Williams*, 3 So.3d 526, 529 (La. App. 5th Cir. 2008); *see also Phillips v. Cain*, Civ. Action No. 11-2725, 2012 WL 2564926, at *13 (E.D. La. Apr. 11, 2012), *report & recommendation adopted*, 2012 WL 2565025 (E.D. La. July 2, 2012). Discrepancies in witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and an appellate court cannot reassess a credibility determination. *State v. Thomas*, 13 So.3d 603, 607 (La. App. 5th Cir. 2008).

A review of the relevant evidence presented at trial was more than sufficient to establish that McClebb died after being shot fourteen times by two different firearms. To prove Ross's identity as the perpetrator, the State introduced evidence from Conrad Jackson. Jackson testified that he went to the Fisher Housing Development on the day of the murder, but claimed that he did not observe anything.[137] Jackson claimed that a woman told him that someone killed her brother.[138]

---

[137] St. Rec. Vol. 4 of 8, Trial Transcript, at p. 13, 3/14/11.

[138] *Id.*

He admitted he previously spoke to Detective Pardo, but claimed that he told him whatever he wanted to hear.[139] Jackson claimed that he did not recall what he told Pardo.[140] Jackson recalled that Pardo showed him a six-person photographic.[141] Jackson, however, claimed that he told Pardo that he knew the names of some of the persons pictured, but that he did not see anyone shoot anyone.[142] Jackson admitted that he signed the back of Ross's photo, but claimed that he told Pardo that he just knew Ross.[143] Jackson admitted that he had known Ross since he was a baby, but he testified that he "didn't see that dude shoot nobody." [144]

The State played Jackson's recorded statement to Pardo for the jury and provided the jury with a transcript of the statement.[145] Jackson admitted that it was his voice on the recording.[146] In his March 26, 2009 statement to Detective Pardo, Jackson stated that he was traveling in a vehicle to the Fisher Housing Project on October 6, 2008.[147] His car was behind the perpetrators' vehicle.[148] Jackson told Pardo that he witnessed the shooting of the victim.[149] Jackson stated that

---

[139]*Id.*

[140]*Id.*

[141]*Id.* at 14.

[142]*Id.* at p. 15.

[143]*Id.*

[144]*Id.*

[145]*Id.* at p. 22.

[146]*Id.* at pp. 15-16.

[147]St. Rec. Vol. 5 of 8, Statement of Conrad Jackson, at p. 1, 3/26/09.

[148]*Id.* at p. 2.

[149]*Id.*

he personally knew one of the shooters, and had known him since he was a baby.[150] Jackson

confirmed that he identified of one of the shooters from a photographic lineup.[151] Jackson could

not recall the make or color of the gun, but stated that the perpetrator carried a gun.[152] Jackson was

positive that the person he identified was one of the perpetrators who shot the victim.[153] Jackson

confirmed that his statement was true and correct, and that he had not been forced, threatened,

coerced, or promised anything for his statement.[154]

After listening to his statement, Jackson repeatedly claimed that he did not witness the

murder.[155] He claimed that Ross's sister told him that someone was killed at a store, but Jackson

claimed that he was nowhere around the area at the time of the murder.[156] Jackson was generally

unresponsive, and he refused to answer questions regarding whether he was concerned for his

safety, or whether he was badly beaten by Ross in prison.[157] He admitted that he was in a fight in

prison, but claimed that Ross was not involved.[158]

---

[150]*Id.* at pp. 2, 3.

[151]*Id.* at p. 2.

[152]*Id.* at p. 3.

[153]*Id.* at p. 4.

[154]*Id.*

[155]St. Rec. Vol. 4 of 8, Trial Transcript, at pp. 23-33, 41, 3/14/11.

[156]*Id.* at pp. 33-35.

[157]*Id.* at pp. 36-38.

[158]*Id.* at pp. 40, 45.

When asked whether he testified before the grand jury, Jackson claimed that he did not know what the prosecutor was talking about.[159] The jury was given an opportunity to review the transcript of Jackson's December 10, 2009 grand jury testimony.[160] Jackson told the grand jury that he was on his way to visit his niece when the vehicle in front of him pulled over, and two men jumped out.[161] He identified the man who exited the passenger side of the vehicle as "Tudy" [sic].[162] He identified the person who exited he driver's side of the vehicle as Ahmad.[163] Jackson testified that there was a third person, but that he did not know his identity.[164] Jackson testified that Tutti (Ross) shot the victim, who was also known by the nickname as "Tudy."[165] Jackson explained that he knew the victim's sister.[166] Jackson explained that he was not far behind the vehicle when it pulled over, but that he eventually passed the perpetrators.[167] He said that he "looked him dead in the face."[168] Jackson explained that he did not immediately provide information to the police because he did not want to get involved because he was in the same area as the perpetrators.[169] He eventually came forward because the violence was getting out of control

---

[159]*Id.* at pp. 41-42.

[160]*Id.* at p. 43; St. Rec. Vol. 5 of 8, Grand Jury Transcript, 12/10/09.

[161]St. Rec. Vol. 5 of 8, Grand Jury Transcript, at pp. 1-2, 12/10/09.
[162]*Id.* at p. 2.

[163]*Id.*

[164]*Id.*

[165]*Id.* at pp. 2-3.

[166]*Id.* at p. 8.

[167]*Id.* at pp. 3-4.

[168]*Id.* at p. 4.

[169]*Id.* at p. 4, 8.

and a lot of people had been shot.[170]  Jackson told the grand jury that Detective Pardo showed him

a photographic line up from which he identified the perpetrator known as Tutti.[171]  Jackson

explained that he had known Tutti (the shooter) since he was young, and that he had seen him a

few times before the shooting.[172]  Jackson admitted that he had called Tutti (the shooter), and that

the voice message included that Ross was a member of the SuWu gang.[173]

After the jury reviewed Jackson's grand jury testimony, Jackson claimed the did not recall

testifying before the grand jury.[174]  He claimed that he did not recall testifying that Ross, who he

knew as "Tootie," shot the victim.[175]  He also claimed he did not recall telling the grand jury that

Ross's voice mail message indicated that he was a member of the SuWu gang.[176]  Jackson denied

telling the grand jury that he originally did not want to get involved because he did not want his

name jeopardized because he lived in the same area.[177]

Assistant District Attorney Margaret Parker testified that she was involved in the screening

process of the homicide case.[178]  She recalled that she spoke to Conrad Jackson on at least three

---

[170]*Id.* at p. 9.

[171]*Id.* at pp. 4-5.

[172]*Id.* at pp. 5-8.

[173]*Id.* at pp. 5-6.

[174]St. Rec. Vol. 4 of 8, Trial Transcript, at p. 44, 3/14/11.

[175]*Id.*

[176]*Id.*

[177]*Id.* at pp. 44-45.

[178]*Id.* at p. 47.

occasions.[179]  Parker testified that the first time she spoke with Jackson was on November 3,

2009.[180]  It was a brief meeting because Jackson, who was incarcerated, was injured and in pain.[181]

Parker testified that Jackson never indicated to Parker that he had been untruthful with Pardo.[182]

Parker recalled that Jackson told her that he witnessed Ross shoot the victim.[183]  Conrad Jackson

also told her that he had known Ross since he was a baby, and that he had spoken to Ross around

the time of the homicide.[184] Jackson told Parker that Ross was a member of the SuWu gang.[185]

Parker testified that she did not offer Jackson anything in exchange for his testimony.[186]  She

recalled that Jackson indicated on many occasions that he was very concerned for his safety as

well as that of his mother and girlfriend. [187]  She further testified that she had spoken to Jackson

on the day of the trial, and that he told her that he was very concerned for his safety if he testified,

and the possibility that he would be incarcerated in the same facility as Ross.[188]  However, at no

time did Jackson deny to Parker that he witnessed the murder.[189]

---

[179]*Id.* at pp. 47, 53.

[180]*Id.*

[181]*Id.* at p. 47.

[182]*Id.* at p. 48.
[183]*Id.* at pp. 47, 53.

[184]*Id.* at pp. 49-50.

[185]*Id.* at pp. 51, 53.

[186]*Id.* at p. 50.

[187]*Id.* at pp. 50-51, 53.

[188]*Id.* at pp. 50-52.

[189]*Id.* at p. 52.

Detective Pardo, the lead investigator of the homicide, testified that he responded to the scene, but the initial canvas of the area did not turn up any witnesses.[190] He was later contacted by the Sheriff's Office with regard to Conrad Jackson, a possible witness to the murder.[191] Pardo spoke to Jackson who told him that he witnessed the murder, and that he knew the perpetrator, who he identified as Eric Ross.[192] Pardo took a recorded statement of Jackson on March 26, 2009.[193] Jackson told him that the SuWu or Whitney Boys were involved in the incident.[194] He explained that he saw two (2) to four (4) people get out of the vehicle.[195]  Jackson told Pardo that he had known Ross since he was a baby.[196]  Pardo presented Jackson with a six (6) person lineup, and Jackson positively identified Ross as one of the perpetrators of the murder.[197]  Pardo denied telling Jackson that he should just say whether he knew any of the individuals pictured.[198] Pardo developed a second suspect and presented Jackson with a photographic line up, but Jackson was unable to identify anyone.[199]

---

[190]*Id.* at pp. 58, 63.

[191]*Id.* at p. 58.

[192]*Id.* at pp. 58, 63.

[193]*Id.* at pp. 58-59, 77-78.

[194]*Id.* at p. 61.

[195]*Id.* at p. 78.

[196]*Id.*

[197]*Id.* at p. 59.

[198]*Id.* at pp. 59-60.

[199]*Id.* at pp. 60-61, 79.

While Jackson recanted his prior statements that he witnessed Ross shoot the victim, the jury obviously found his original statements to Pardo, Parker, and the grand jury, as well as the testimony of Pardo and Parker to be credible and rejected Conrad Jackson's trial testimony. *Jackson* limits this Court's review to the evidence before the trier of fact and does not allow the Court to reassess the weight and credibility of the evidence. *See Jackson*, 443 U.S. at 319 (finding that such matters are left to the factfinder). Specifically, the determination of the credibility of a witness is within the province of the jury and is not to be disturbed on habeas review. *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions); *Holderfield*, 903 F. Supp. at 1018 (citing *United States v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991) ) (The habeas court should defer to the jury's resolution of credibility determinations and justifiable inferences of fact.). The jury's resolve was reasonable and supported by the evidence and testimony.

A rational trier of fact, after viewing this evidence in the light most favorable to the prosecution, could easily find beyond a reasonable doubt that Ross shot and killed McClebb. The state courts' rejection of Ross's insufficient evidence claim does not present an unreasonable application of Supreme Court precedent to the facts of this case. Ross is not entitled to relief on this claim.

## VII.    Admission of Grand Jury Testimony (Claim Three)

Ross claims that the admission of Jackson's grand jury testimony for impeachment purposes violated his constitutional right to due process as well as the Louisiana grand jury secrecy clause, Louisiana Constitution Article V, Section 34(A). He specifically claims that the admission of the evidence permitted "the invasion of the province of the grand jury secrecy in its

proceedings."[200]   He further claims that the prosecution did not provide sufficient reasons warranting the admission of Jackson's grand jury testimony.

The States responds that Ross's claim as it relates to violation of Louisiana law is not cognizable.  It further claims that Ross's due process claim is also not cognizable because any federal law relating to grand jury secrecy applies only to federal grand jury testimony and not rely on the Constitution.

At trial, Conrad Jackson, who was a recalcitrant witness, repeatedly testified on direct examination that he did not witness the murder.[201] The Trial Court found that the prosecution could utilize Jackson's grand jury testimony to impeach his testimony.[202] When asked by the prosecution whether he recalled testifying before the grand jury, Jackson testified, "I don't know what he is talking about."[203] The State offered Jackson's grand jury testimony, which was admitted and published to the jury over the defense's objection.[204] Thereafter, Jackson claimed that he did not remember telling the grand jury that Eric Ross shot the victim or that Ross was a member of the SuWu gang.[205] He further claimed that he did not recall testifying before the grand jury that he originally did not want to get involved because he did not want to put his life in jeopardy.[206]

---

[200]Rec. Doc. 1-1, at p. 17.
[201]St. Rec. Vol. 4 of 8, Trial Transcript, at pp. 13, 15, 23-34, 41, 3/14/11.

[202]*Id.* at pp. 20-21.

[203]*Id.* at pp. 42-43.

[204]*Id.*

[205]*Id.* at p. 44.

[206]*Id.* at pp. 44-45.

On direct appeal, Ross claimed that the Trial Court erred in in allowing the prosecution to use Jackson's grand jury testimony to impeach him.  The Louisiana Fourth Circuit found that the Trial Court abused its discretion in admitting Jackson's grand jury testimony.[207] The Louisiana Supreme Court, addressing Louisiana Constitution, Article V, § 34(A) and La. Code Crim. P. art. 434 relating to the secrecy of the grand jury, reversed, and found that "the State demonstrated a compelling need for the grand jury material sought, as the sole eyewitness to the crime recanted, at trial, his prior statements identifying the defendant as the murderer."[208]  In doing so, the Louisiana Supreme Court noted that, in interpreting its state grand jury secrecy laws, it followed federal jurisprudence, and that the jurisprudential prerequisites for disclosure of the grand jury testimony were satisfied.[209]

As an initial matter, to the extent Ross complains that the admission of Jackson's grand jury testimony violated Louisiana law, the alleged violation of state law standards does not merit federal habeas corpus review or relief.  It is well settled that states are free to implement procedures regarding the presentation and admission of evidence, provided that those procedures do not infringe on a constitutional guarantee.  *Riggins v. Nevada*, 504 U.S. 127, 147 (1992); *Burgett v. State of Texas*, 389 U.S. 109 (1967).  Therefore, federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings violate due process such that the violation renders the criminal proceeding fundamentally unfair.  *Riggins*, 504 U.S. at 147 (quoting *Lisenba v. People of the St. of Ca.*, 314 U.S. 219, 236–37 (1941)); *see also Swarthout v. Cooke*, 562 U.S.

---

[207]*Ross*, 144 So. 3d at 1039-40; St. Rec. Vol. 5 of 8, 4th Cir. Opinion, 2011-KA-1668, at pp. 4-5, 12/19/12. .

[208]*Ross*, 144 So. 3d at 941; St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2013-K-0175, at p. 12 (La. 3/25/14).

[209]*Id.* at 937, 939, 941 (citations omitted); St. Rec. Vol. 7 of 8, La. S. Ct. Order, 2013-K-0175, at pp. 7, 10-11, 13 (La. 3/25/14) (citations omitted).

216, 219 (2011) (federal habeas review does not lie for errors of or in applying state law). Thus, his claim that the courts violated state law is not cognizable.

In support of his claim that the admission of Jackson's grand jury testimony to impeach his credibility violated his right to constitutional right to due process, Ross relies on *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), *United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958), and *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425 (1983).

In *Socony-Vacuum*, which involved the use of grand jury testimony to refresh the recollection of witnesses in a federal price-fixing prosecution, the Supreme Court found that "[g]rand jury testimony is ordinarily confidential ... [b]ut after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." *Socony-Vacuum,* 310 U.S. at 233-34 (citations omitted).

In *Procter & Gamble*, the Supreme Court interpreted the "good cause" requirement of Fed. R. Civ. P. 34 as it applied to grand jury testimony. *Procter & Gamble*, 356 U.S. at 681-83. The Court specifically noted, however, that "[w]e do not reach in this case problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like." *Id.* at 683 (footnote omitted).

*Sells* addressed an earlier version of Fed. R. Crim. P. 6(e), which codifies the rule of grand jury secrecy in federal courts. *Sells Engineering, Inc.,* 463 U.S. at 426. Therein, the Supreme Court held that, under Rule 6(e), disclosure of grand jury materials to government attorneys in a civil suit is permissible only after a showing of "particularized need." *Id.* at 443.

None of the foregoing decisions relied on by Ross address grand jury secrecy as it relates to due process or involve any constitutional analysis. Rather, the decisions address the rules

relating to federal grand juries.  However, as noted by the State, "neither the Grand Jury Clause of the Fifth Amendment nor the Due Process Clause of the Fourteenth Amendment requires the state to afford the accused the right to grand jury review before trial." *Wilkerson v. Whitley*, 28 F.3d 498, 502 (5th Cir. 1994) (citing *Hurtado v. California*, 110 U.S. 515 (1984)).

Ross fails to point to any clearly established Supreme Court supporting his claim that his right to due process was violated by the use of Jackson's grand jury testimony to impeach his trial testimony. The state courts' decision was not contrary to, or an unreasonable application of, Supreme Court law.  Ross is not entitled to relief as to this claim.[210]

## VIII.   Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Eric Ross's petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from

---

[210]The State is correct that Ross does not, in his habeas application, raise a claim that the use of Jackson's grand jury testimony violated Ross's right to confrontation.  *See* Rec. Doc. 15, at pp. 24-25.  Furthermore, Ross did not raise a confrontation clause claim at any level of the state courts.  He also did not make "the type of arguments that support a Confrontation Clause claim," nor did he cite to any Louisiana cases mentioning the federal confrontation right.  *Compare Taylor v. Cain*, 545 F. 3d 327, 333-34 (5th Cir. 2008) (finding a federal Confrontation Clause claim exhausted despite the petitioner's focus on state hearsay rules in the state courts.).  Rather, Ross repeatedly claimed that admission of the evidence constituted a breach of grand jury secrecy.  *See* St. Rec. Vol. 4 of 8, Trial Transcript, at p. 21, 3/14/11 (defense counsel stated, "My only concern is that without direction for the Court, it's secret.  If you're willing to let it in then –"); St. Rec. Vol. 5 of 8, Appellate Brief, 2011-KA-1668, at pp. 9-15 1/6/12; St. Rec. Vol. 7 of 8, Response to Writ Application, 13 K 175, at pp. 7-14, 11/4/13.  Thus, any confrontation clause issue, had it been raised in his habeas application, would be unexhausted.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including discretionary review when that review is part of the State's ordinary appellate review procedures.).

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[211]

New Orleans, Louisiana, this 19th day of April, 2023.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[211]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.